UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

AVERY BAKER,

                    Petitioner,              **DECISION AND ORDER**
 -vs-                                         **No. 11-CV-6295(MAT)**

BRIAN FISCHER, Commissioner,
NYS Dept. of Correctional Services,

                    Respondent.
_____

## I.   Introduction

Avery Baker ("Baker" or "Petitioner"), proceeding <u>pro se</u>, has
filed this 28 U.S.C. § 2254 petition for a writ of habeas corpus
challenging the September 10, 2007, judgment of the New York State
County Court, Chemung County, convicting him, following a jury
trial, of Murder in the Second Degree (New York Penal Law ("P.L.")
§ 125.25(4)), Manslaughter in the First Degree (P.L. § 125.20(4)),
Manslaughter in the Second Degree (P.L. § 125.15(1)), Reckless
Endangerment in the Second Degree (P.L. § 120.20), and Endangering
the Welfare of a Child (P.L. § 260.10(1)).

## II.   Factual Background and Procedural History

### A.   Overview

On September 12, 2006, Petitioner threw a twenty-month-old
child, Jordan Steiner ("Jordan"), into the child's metal crib.
Jordan was the son of Petitioner's girlfriend, Kelly Steiner
("Steiner"). Later that night, Jordan had a seizure and was
hospitalized overnight. Three days later, when the child drew on a

television set with a crayon, Petitioner became incensed. After spanking Jordan, Petitioner picked him up, violently shook him, and threw him to the ground. Jordan died as the result of his head striking the floor. Petitioner initially denied any involvement in Jordan's death, but later gave a written statement to police admitting that he had thrown Jordan to the ground.

On October 19, 2006, a Chemung County grand jury indicted Petitioner on charges of Murder in the Second Degree (P.L. § 125.25(4)), Manslaughter in the First Degree (P.L. § 125.15(1)), Reckless Endangerment in the Second Degree (P.L. § 120.20), and two counts of Endangering the Welfare of a Child (P.L. § 260.10(1)). Petitioner moved to suppress the statements he made to police, and following a hearing pursuant to <u>People v. Huntley</u>, 15 N.Y.2d 72 (1965), the trial court denied the motion. On July 16, 2007, petitioner proceeded to a jury trial before the Honorable Peter C. Buckley.

**B.   The Trial**

**1.   The Prosecution's Case**

On September 12, 2006, Petitioner was with Steiner, her twenty-month-old son Jordan, and Petitioner's son Jamal Baker, in Kelly's Elmira apartment. By all accounts, Jordan was a healthy child. T.537-46. During their four months together, Petitioner had repeatedly physically abused Kelly. T.368-76, 470-71. That night, Petitioner had tried to choke her. T.468-69. Steiner left the

apartment to take out the trash and when she returned, Jordan was crying alone in his room. Petitioner said Jordan was being punished for misbehaving. T.377-80.

Petitioner subsequently carried Jordan by one arm from the living room to the bedroom, where Steiner heard Petitioner loudly throw the child into his metal crib. T.247-48, 382-85. Steiner did nothing to intercede on behalf of her child. Later, when Steiner checked on Jordan, he was "breathing funny," turning blue, and his lips were pale; he then arched his back, went limp, and made very little sound. T.385-88. Petitioner called 911 and told the operator that Jordan was having a seizure. T.341, 389-90. Jordan was hospitalized overnight and released. T.390-91, 546-66, 592-600. Petitioner lied to Chataya Adams (Jordan's father's girlfriend) about the incident, telling her that Jordan had been running a fever. T.622.

Joann Swann babysat for Jordan and Jamal on September 14, 2006, and noticed nothing unusual about Jordan. T.168-79, 398-402.

In the early morning hours of September 15, 2006, Petitioner became angry when he saw Steiner cleaning up the television because it had crayon on it. T.402-08. When Jamal told Petitioner that Jordan had colored on the television, Petitioner instructed Kelly to get Jordan out of bed, and she awakened the sleeping child and walked him into the living room. T.408-09. Petitioner pulled Jordan up by one arm and spanked him; Jordan began to cry. T.409. Again,

Steiner did not act to protect her child. Petitioner took Jordan to the apartment's entrance where Steiner could not see them, but could hear Jordan crying after Petitioner placed him in a corner. T.410-11.

A short time later, Steiner saw petitioner pick up Jordan by the child's armpits, raise the child to face level, and shake him violently. T.414-15. Petitioner, who is stands about six-feet, five-inches tall, and weighs around two hundred and eighty-five pounds, then threw Jordan to the ground where Jordan hit his back and head. T.415-16. Neighbor Karen Lopez heard Petitioner tell Jordan to shut up, and then she heard a "boom". T.484-91.

Jordan tried to stand up but could not. T.418-19. When Petitioner picked the child up, Jordan took two breaths but stopped breathing. T.419-20. Petitioner moved the child to the sofa, and Kelly suggested they call 911. Petitioner, who happened to be a trained EMT, told her to wait ten minutes "because he will come out of it like he did last time." T.420-22. Petitioner eventually called 911 and reported that Jordan was having a seizure. T.342, 423.

When EMT John Curione arrived at the apartment, Jordan had no pulse and was not breathing. T.107-16, 134-48. Petitioner failed to tell EMT Christopher Smith that he had thrown the child. T.73-77, 87. When Jordan arrived at St. Joseph's Hospital, he was "lifeless" and was pronounced dead. T.87-91, 117-19, 134-52, 351-57.

-4-

At the hospital, Petitioner falsely told Jordan's father, Lajuan Coleman ("Coleman") and Coleman's girlfriend, Chantaya Adams ("Adams"), that he had seen Jordan having a seizure, and had immediately called an ambulance, but by the time it arrived Jordan was dead. T.516, 624.

Elmira Police Officer Amy Taft ("Taft") responded to the hospital, where she spoke with Petitioner in the waiting room about why Jordan had been brought to the hospital. Petitioner lied to Taft, saying that after Steiner had called him into the living room where Jordan was limp and unresponsive, Petitioner held Jordan. When he saw the child was having difficulty breathing, he called 911. T.184-188.

Petitioner and Steiner then went with Investigator Brian Ellis ("Ellis") to the Elmira Police Department to assist with the preliminary investigation into Jordan's death. T.211-12. When Ellis began to interview petitioner, he did not administer <u>Miranda</u> warnings because the police did not know what had happened, and were in the preliminary investigation stage. T.212-14. Petitioner initially denied having any involvement in Jordan's death. He offered a third false story, explaining that Steiner had checked on Jordan after hearing him gasping, and had called to Petitioner. When Petitioner picked Jordan up, he "went stiff." T.214-18.

Petitioner attempted to shift the blame on Jordan's biological father, asking Ellis was questioning him instead of Coleman. T.215,

364-65, 498-99. Ellis typed a statement describing the events Petitioner had related, and Petitioner signed it. T.218-19, 229-33. Petitioner was free to leave, but waited at the police station more than three hours while Steiner completed her interview. T.219-22. When the police had finished questioning Steiner, Ellis drove them back to Steiner's apartment. T.222.

Later that day, forensic pathologist Paul Gosink, M.D. ("Dr. Gosink") conducted an autopsy and determined that the cause of Jordan's death was blunt force injuries of the skull, with a subarachnoid hemorrhage. T.223-24, 689-91, 729-30. When Sergeant William Bresser ("Bresser") and other officers received notice of the preliminary autopsy results, they returned to Steiner's apartment and requested that Steiner to accompany him to the police station for questioning. Petitioner asked if he could go with them, and Bresser assented. T.271-73, 632-35.

Bresser and Investigator Richard Weed ("Weed") administered Miranda warnings, and Petitioner waived his rights. T.275-76, 635-41. After about an hour and one-half to two hours, Professor James Chapman ("Chapman"), a forensic expert employed as a consultant by the Elmira Police Department, joined the questioning. T. 276-77, 641-48. During the questioning, Petitioner gave varying and widely disparate versions of Jordan's death, including that the boy had died of a seizure, had been running and hit his head on a door, and had accidentally fallen to the floor. T.280-83.

-6-

Eventually, Bresser and Weed left the room, and Petitioner told Chapman that he had been angry with Jordan for writing on the television set with crayon. He had then spanked Jordan, picked him up, shook him, and thrown him to the ground. Chapman testified that Petitioner stated that "he slammed the child to the floor in a manner that you would bounce pass a basketball." Petitioner also admitted lying to the police and medical personnel about how Jordan had been injured. T.190-201, 284-85, 648-51. Petitioner signed a written statement containing those admissions. T.285-86, 651-59.

### 2.   The Defense Case

Petitioner called neuropathologist Peter Ostrow, M.D. ("Dr. Ostrow"), as the sole defense witness. Dr. Ostrow reviewed Jordan's medical records and autopsy photographs, and concluded that Jordan's immediate cause of death was "hypoxia" or a lack of oxygen, which had been caused by a blow or blows to the head. Brain swelling was a contributing factor to the child's death. T.774-77, 779-84, 787-801, 809-10, 821-27.

### 3.   The Verdict and Sentencing

The trial court, with the prosecutor's consent, dismissed the child endangerment count arising from Petitioner's conduct on the date of death, September 15, 2006. T.852-60. However, the child endangerment count arising from Petitioner's actions on September 12, 2006, was not dismissed and was submitted to the jury. The jury found Petitioner guilty of all of the remaining counts. T.1047-50.

-7-

For his heinous crimes, Petitioner received indeterminate prison terms of twenty years to life for the second degree murder conviction and five to fifteen years for the second degree manslaughter conviction. The prison terms were set to run concurrently to each other and to a determinate twenty-year prison term for first degree manslaughter. For the first degree manslaughter offense, Baker also received a five-year term of post-release supervision. With regard to the convictions for endangering the welfare of a child and reckless endangerment, he received two one-year determinate prison terms, both of which were ordered to run concurrent to each other but consecutive to the sentences for the homicide offenses. Finally, the trial court ordered Baker to pay restitution for Jordan's funeral services.

**B.    The Direct Appeal**

Represented by new counsel on direct appeal, Petitioner filed a brief in the Appellate Division, Third Department, claiming that (1) the trial court violated Petitioner's Sixth Amendment right to a public trial by excluding Brower from the courtroom where the possibility that she would be called to testify as a prosecution rebuttal witness was speculative; (2) the conviction for depraved indifference murder was against the weight of the evidence; (3) the trial court denied petitioner a fair trial when it allowed the prosecutor to display to the jury during summation a verbatim recitation of the statutory language defining depraved indifference

-8-

to human life and recklessness; (4) the trial court denied petitioner a fair trial when it instructed jurors to return a verdict on all three homicide counts even though each count required a different mental state; and (5) trial counsel provided ineffective assistance by failing to object to the court's instruction to return a verdict on all counts as well as the jury's resulting verdict.

In a decision entered on January 29, 2009, the Third Department unanimously affirmed Petitioner's conviction. People v. Baker, 58 A.D.3d 1069 (3d Dept. 2009). In an order dated May 11, 2009, an Associate Judge of the New York Court of Appeals granted leave to appeal. People v. Baker, 12 N.Y.3d 851 (2009). Petitioner then briefed three of the issues raised in the Third Department. On March 25, 2010, the Petitioner's conviction was unanimously affirmed. People v. Baker, 14 N.Y.3d 266 (2010).

**C.   The Federal Habeas Petition**

This timely petition followed in which Petitioner raises the following three grounds for relief:  (1) the exclusion of Brower from the courtroom violated Petitioner's Sixth Amendment right to a public trial; (2) in violation of Petitioner's due process right to a fair trial, the prosecutor improperly used a Power Point slide presentation during summation to display the statutory language defining depraved indifference to human life and recklessness; and (3) Petitioner's Sixth Amendment right to the effective assistance

-9-

of trial counsel was violated when counsel failed to ask the trial court to instruct jurors to consider the three homicide counts in the alternative, rather than instructing jurors to return a verdict for all three homicide counts. See Petition ("Pet.") at 7-11 (Dkt. #1). Respondent answered the petition, interposing the defense of non-exhaustion as to the claim of prosecutorial misconduct.

Petitioner filed a motion to stay (Dkt. #6) and a motion to appoint counsel (Dkt. #16). The motion for appointment of counsel was denied by the Court (Larimer, D.J.) without prejudice on December 21, 2011 (Dkt. #18). Petitioner's motion for a stay remains pending. Respondent has opposed the motion (Dkt. #11), and Petitioner has filed a reply (Dkt. #17). Petitioner has not renewed his motion for pro bono counsel.

For the reasons discussed below, the request for a writ of habeas corpus is denied and the petition is dismissed. The motion for a stay is denied with prejudice.

## III. Analysis of the Petition

### A.   Sixth Amendment Denial of Right to Public Trial

#### 1.   Factual Background

After jury selection, defense counsel requested that the trial court "exclude anyone that's a potential witness in this case from the courtroom from observing," and the court granted the request. T.8. The prosecutor then informed the court that he had noticed that a woman who was on Petitioner's witness list, Christine Brower

-10-

("Brower"), was still in the courtroom. Trial counsel responded that he had not spoken with Brower about whether or not she could be in the court. The judge permitted a recess for defense counsel to speak with Brower off the record.

Later, during an in-chambers conference held during the direct examination of the prosecution's first witness, trial counsel informed the trial court that Brower was present in the courtroom even though she had appeared on Petitioner's witness list, and he had served her with a subpoena. T.80. Brower, who was Petitioner's girlfriend and the mother of two of Petitioner's children, apparently was represented by an attorney in a related Family Court matter. Brower's attorney had not allowed Petitioner's defense counsel to interview Brower in connection with Baker's murder prosecution. T.80-81.

Although he had been unaware that Brower would attend the trial, defense counsel announced his "inclination to put her on the stand." T.80. He also stated, contradictorily, "I wouldn't intend at this point to put Christine Brower on the stand." T.80. When the trial court inquired whether Brower had relevant information about Petitioner's case, defense counsel responded that Brower did not have knowledge about the "incident" because she had not been present, and that any information she possessed would be "more of a background kind of thing, character kinds of information." T.81.

When the trial court asked whether the defense would call Brower as a witness, trial counsel responded, "Not at this point. I can't." T.81-82. The trial court repeated the question, and defense counsel replied that when he saw Brower in the courtroom, he had instructed her to leave the courtroom to speak with her lawyer "in [sic] the chance her public defender would change her mind or allow me to talk to her." T.82. Defense counsel explained he would not call Brower as a witness if he did not talk to her first, and since her lawyer had advised her not to speak with him, "she is not going to be a witness for [him]." T.82.

The prosecutor then stated that he did not "know what role [Brower] may play later in this trial." T.82. Even though Brower was not on the prosecution's witness list, the assistant district attorney asked that she be removed from the courtroom because he "d[idn't] know how this thing is going to go," in terms of what issues would be raised at trial, and it was possible he would call Brower as a rebuttal witness. T.82-83. Defense counsel objected, stating, "My client wishes her present. It [sic] is the mother of his children. I think people have the right to attend trials." T.83. The prosecutor expressed his belief Brower "may have some relevant information" and "may be called as a witness." T.83.

Noting that there had not been an offer of proof as to any relevant information Brower might possess, that Brower had only been on Petitioner's witness list, and that defense counsel had

stated that he would not call her to testify, the judge
nevertheless excluded her on the basis that the prosecutor "says
that she could be a witness. . . ." Id. If, however, the prosecutor
assured the court that Brower was "not likely to be a [prosecution]
witness on rebuttal, then she can stay." T.83. The prosecutor
demurred, stating, "I don't know where the trial is going to go
with any absolute certainty from the defense side," and requesting
Brower be excluded. T.83-84. Over defense counsel's objection, the
trial court excluded Brower, stating, "She's on the original
witness list, we've already questioned the jury about it." T.84.

Upon returning to the courtroom, but before the jurors were
seated, the prosecutor informed the court that Petitioner's mother,
Crystal Speight ("Speight"), who also was on Petitioner's witness
list, was in the courtroom. T.84-85. The prosecutor stated,
"[W]e're just making an application to exclude any potential
witnesses, which I thought I had done before." T.86. Defense
counsel noted that he had subpoenaed and interviewed Speight, and
had discussed with Petitioner both Speight's potential testimony,
and the fact that, if she attended the trial, she would not be
allowed to testify. T.85. According to trial counsel, after the
submission of the defense witness list, he and Petitioner had
decided that his mother would not testify. T.85-86. The trial court
accordingly allowed Speight to remain in the courtroom. T.86.

##### 2.   The State Court's Adjudication on the Merits

The New York Court of Appeals ("the Court of Appeals") found that the trial court did not violate Petitioner's Sixth Amendment right to a public trial by granting the prosecutor's request to exclude Brower from the courtroom because she was a potential witness. As the Court of Appeals explained, the trial court had the discretion to exclude potential witnesses without contravening the Sixth Amendment. Id. (citing People v. Santana, 80 N.Y.2d 92, 100 (1992); People v. Cooke, 292 N.Y. 185, 191, 54 N.E.2d 357 (1944)). In this case, the Court of Appeals concluded that the trial court's finding that Brower might be called as a prosecution rebuttal witness "was not unreasonable", notwithstanding the trial counsel's indication that he would not call her to testify due to her attorney's preclusion of an interview with Petitioner's counsel.

The Court of Appeals noted that "the fact that the court allowed [Petitioner]'s mother to remain in the courtroom undermine[d] [his] claim that the trial court sought to remove his relatives and friends from the courtroom[,]" id. (citations omitted). In short, the Court of Appeals found, "[t]he constitutional cases defendant cites (see[,] e.g.[,] Waller v. Georgia, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984); People v. Nieves, 90 N.Y.2d 426, 660 N.Y.S.2d 858, 683 N.E.2d 764 (1997)), therefore have no bearing to this case." People v. Baker, 14 N.Y.3d

at 274. Notably, the Court of Appeals did not view this as a constitutional claim.

### 3.   The Sixth Amendment Right to a Public Trial

For claims adjudicated on the merits by a state court, the deferential standard of review codified in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 103-132, 110 Stat. 1214, applies. A habeas petitioner can only obtain habeas corpus relief by showing that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1).

The Supreme Court has clearly established that the Sixth Amendment guarantees a criminal defendant the right to a public trial. E.g., Duncan v. Louisiana, 391 U.S. 145, 148 (1968). The controlling Supreme Court case regarding the closure of courtrooms under the Sixth Amendment is Waller v. Georgia, 467 U.S. 39 (1984). In Waller, the state trial court had closed an entire suppression hearing to all persons other than witnesses, court personnel, the parties, and their lawyers, in order to prevent unnecessary "publication" of information contained in the wiretaps, which would render the wiretaps tainted and inadmissible under state wiretap law. See Waller, 467 U.S. at 41-42. The Georgia Supreme Court upheld the closures on appeal, finding that the trial court "had properly balanced petitioners' rights to a public hearing against

the privacy rights of others under . . . the Sixth Amendment." Id. at 43. The United States Supreme Court reversed, finding that closure of the entire suppression hearing, without specific findings as to "whose privacy rights might be infringed, how they would be infringed, what portions of the [wiretap] tapes might infringe them, and what portion of the evidence consisted of the tapes," was unduly "broad and general," and therefore in potential violation of the defendants' Sixth Amendment right to a public trial. Id. at 48-50. Waller made clear, however, that "the right to an open trial" is not absolute, and "may give way in certain cases to other rights or interests." Id. at 45.

Review of Baker's case under Waller "is complicated by the fact that the Supreme Court has never applied the Waller factors in the context of a *partial* closure of the courtroom." Goris v. Goord, No. 04 Civ. 8011(PAC), 2006 WL 2347812, at *7 (S.D.N.Y. Aug. 10, 2006) (emphasis supplied). Likewise, the Supreme Court has "never applied the Waller factors in the context of a targeted closure, i.e., closure of a courtroom only to specific individuals such as some but not all of defendant's family members or friends." Goris, 2006 WL 2347812, at *7 (citing Yung v. Walker, 341 F.3d 104, 110 (2d Cir. 2003)).

Waller involved a total closure of the courtroom to all individuals "other than witnesses, court personnel, the parties, and the lawyers," 467 U.S. at 42, but such is not the case here.

-16-

Understandably, then, the Court of Appeals did not analyze the courtroom-closure issue under Waller. Unlike Waller, the trial judge in Baker's case excluded only one individual who was identified as a potential rebuttal witness for the prosecution. It is well settled that, as a matter of New York law and federal evidentiary law,[1] the trial court possesses discretion to exclude witnesses from the courtroom while other witnesses are testifying. People v. Santana, 80 N.Y.2d at 100 (citing, inter alia, People v. Cooke, 292 N.Y. at 190-9; 6 Wigmore, EVIDENCE § 1838, at 461 (Chadbourn rev. 1976) (noting that the truth-seeking function of the trial process is furthered by "preventing one prospective witness from being taught by hearing another's testimony")).

The exclusion of potential witnesses during the testimony of other witnesses is routine during criminal trials, and is important because it negates the possibility that their testimony will be tainted or influenced by their having observed other witnesses' testimony on the same or similar topics. See Daughtry v. Quinn, No. C06-5051 FDB, 2006 WL 2672084, at *1 (W.D. Wash. Sept. 18,

---

[1]

Rule 615 of the Federal Rules of Evidence provides that at a "party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony" unless they fit within one of four exempted categories. FED. R. EVID. 615. The exceptions apply to "(a) a party who is a natural person; (b) an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney; (c) a person whose presence a party shows to be essential to presenting the party's claim or defense; or (d) a person authorized by statute to be present." FED. R. EVID. 615.

2006) ("[T]he trial court here did not completely close the courtroom. It merely ordered the five subpoenaed witnesses, two of whom the defense later called to testify, to remain outside the courtroom during Laura's testimony. . . . Based on this record and the limited nature of the trial court's order, we find no abuse of the court's substantial authority to regulate the conduct of a trial.").

Here, the record demonstrates that defense counsel, despite asserting that he would not call Brower as a witness, also had equivocated on that issue. Defense counsel's final statement on the subject was he would not call Brower as a witness "if I don't talk to her first", T.82, suggesting that it was possible counsel *would* seek to call Brower as a witness if he could to arrange an interview with her prior to her testimony.

After the foregoing comments by defense counsel, the prosecutor stated that he did not "know what role [Brower] may play later in this trial", T. 82, and asked that she be removed from the courtroom because he "d[idn't] know how this thing is going to go," in terms of what issues would be raised at trial. T.82-83. The prosecutor then stated that he believed Brower "may have some relevant information" and "may be called as a witness." T.83. Trial court exercised its discretion to exclude Brower, stating, "If the District Attorney says that she could be a witness, I am going to

exclude her," T.83, and noting that "[s]he's on the original witness list, we've already questioned the jury about it." T.84.

In light of the above, the New York Court of Appeals reasonably found that the exclusion of Brower from the courtroom as a potential witness did not contravene Sixth Amendment courtroom-closure jurisprudence. See Daly v. United States, No. 97-CV-2385 (TCP), 2012 WL 1672932, at *2 (E.D.N.Y. May 10, 2012) ("Daly's Rule 60(b) motion . . . relies upon the law applicable to courtroom closures as opposed to the exclusion of potential witnesses. Rodriguez [v. Miller, 537 F.3d 102 (2d Cir.2008)] . . . does not apply to the alleged constitutional violation in Daly's trial, i.e., denial of the right to a public trial due to the exclusion of potential witnesses. Rather, the holding in Rodriguez applies to situations where a party seeks to have a courtroom fully or partially closed from members of the public. Rodriguez, 537 F.3d at 108 (citing Waller, 467 U.S. at 48). By its plain language, . . . , FRE 615 applies to the exclusion of potential witnesses from the courtroom, which was the situation in Daly's case. . . . [A] reasonable jurist could not find application of the relevant rule, i.e., exclusion of potential witnesses under FRE 615, an abuse of the Court's discretion.") (internal parenthetical to Waller omitted). Therefore, habeas relief is not warranted on this claim.

B.      **Prosecutorial Misconduct**

1.   **Exhaustion**

AEDPA provides that federal courts may not grant a petition for habeas corpus unless "the applicant has exhausted the remedies available in the courts of the state," 28 U.S.C. § 2254(b)(1)(A), "there is an absence of available State corrective process[,]" id., § 2254(b)(1)(B)(i), or "circumstances exist that render such process ineffective to protect the rights of the applicant[,]" id., § 2254(b)(1)(B)(ii). "Exhaustion of state remedies requires that a petitioner fairly present federal claims to the state courts in order to give the state the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." Carvajal v. Artus, 633 F.3d 95, 104 (2d Cir. 2011) (citation omitted). "In order to have fairly presented his federal claim to the state courts the petitioner must have informed the state court of both the factual and the legal premises of the claim he asserts in federal court." Daye v. Attorney Gen'l of N.Y., 696 F.2d 186, 191 (2d Cir. 1982) (en banc).

While a state petitioner is not required to cite "chapter and verse of the Constitution" to exhaust a claim, he must present his challenge "in terms that are likely to alert the state courts to the claim's federal nature[,]" Carvajal, 633 F.3d at 104 (citation omitted), such as by (a) relying on pertinent federal cases employing constitutional analysis, (b) relying on state cases

employing constitutional analysis in fact like situations, (c) asserting the claim in terms so particular as to call to mind a specific right protected by the Constitution, or (d) alleging a pattern of facts that is well within the mainstream of constitutional litigation. Id. (citing Daye, 696 F.2d at 194).

On direct appeal, Baker couched his prosecutorial misconduct claim solely in state law terms. Respondent argues that this claim is therefore unexhausted. The Court disagrees. The Second Circuit holds that "the claim of prosecutorial misconduct ha[s] sufficiently familiar federal constitutional implications to be within the mainstream of constitutional litigation," thereby satisfying Daye's fourth method of "fair presentment". Garofolo v. Coomb, 804 F.2d 201, 205 (2d Cir. 1986); accord, e.g., Lugo v. Kuhlmann, 68 F. Supp.2d 347, 367 (S.D.N.Y. 1999) (collecting cases); see also Villacorta v. Supreme Court, N.Y. Cty., 10 Civ. 9516(DLC), 2011 WL 3251816, at *7 (S.D.N.Y. July 29, 2011) ("On direct appeal, Villacorta couched her prosecutorial misconduct claim solely in state law terms. Nevertheless, respondents concede that this claim has been exhausted since 'a claim of prosecutorial misconduct on summation calls to mind specific rights protected by the constitution' and therefore this issue was fairly presented to the state court.") (citation omitted).

### 2.   Merits

Petitioner contends that the prosecutor violated his due process right to a fair trial  during summation by using a Power Point slide presentation to display the statutory language defining depraved indifference to human life and recklessness. Petitioner does not contend that the prosecutor's materials inaccurately represented the statutory language, but rather that the prosecutor's actions intruded upon the trial court's "exclusive province of instructing the jury on the law" and created the risk of emphasizing those instructions over other unnamed instructions "favorable to the defense." Pet. at 9.

The Court of Appeals found that the Power Point slides in the record  "contain[ed] virtually verbatim definitions of depraved indifference murder and recklessness as set forth in the pattern Criminal Jury Instructions[,]" 14 N.Y.3d at 273 (citation omitted), and they incorporated the Court of Appeals' most recent jurisprudence on the issue, id. The Court of Appeals found it significant that Petitioner "concede[d] that the content of the slides accurately described the legal definition of those terms [i.e., depraved indifference and recklessness]." Id. Rather than condemning the prosecutor's use of the slides as improper, the Court of Appeals noted that they "could have assisted the jury in differentiating between ordinary recklessness for manslaughter and

the extreme recklessness and heightened mental state that is needed to establish depraved indifference." Id.

The Court of Appeals further found that the trial court took appropriate steps to remind the jurors that it was the final source of the law. Prior to summation, the trial court explained, "I am responsible for setting forth the law, not the lawyers," and had explained to the jury that the lawyers each had a copy of the instructions the court would give, and might refer to those instructions during closing arguments. Id. The trial court cautioned jurors to listen carefully to the instructions it would give following summations, and told them that if there were any difference between statements made during summations and the court's instructions on the law, "[Y]our sworn duty as jurors is to follow my instructions on the law." Id. Moreover, during its final charge, the trial judge again instructed jurors that they were obligated to "apply to the facts the law as I explain it." Id. The prosecutor' slides properly "were not given to the jury to review during deliberations." Id. (citation omitted).

The Court of Appeals concluded that "the judge's instructions were sufficient to dispel any possibility that the jury would give precedence to or place undue emphasis on the prosecutor's use of the slides." Id. (citation omitted). Because the jurors were presumed to have followed the court's instructions on the law, and given the trial court's appropriate cautionary instructions, the

-23-

Court of Appeals held "that the use of the slides in this case did not prejudice [Petitioner] or undermine his right to a fair trial." Id. As a result, the Court of Appeals concluded, the trial court did not abuse its discretion as a matter of law by allowing the prosecutor's use of slides during summation. Id.

The foregoing adjudication on the merits is entitled to the deferential AEDPA standard of review set forth in 28 U.S.C. § 2254(d)(1). Baker may obtain relief on his prosecutorial misconduct claim only if he can demonstrate that the New York Court of Appeals unreasonably applied clearly established Supreme Court law regarding this issue.

The Supreme Court has repeatedly held that "[a] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone." United States v. Young, 470 U.S. 1, 11 (1985); accord, e.g., United States v. Newton, 369 F.3d 659, 680 (2d Cir. 2004) (citing Young, 470 U.S. at 11). A reviewing court "must consider the probable effect the prosecutor's [remarks] would have on the jury's ability to judge the evidence fairly." Young, 470 U.S. at 12. Particular factors considered by the Second Circuit in "assessing whether a defendant has sustained substantial prejudice, . . . [include] . . . the severity of the alleged misconduct, any curative measures taken by the trial court, and the likelihood of conviction absent the challenged conduct." Newton,

369 F.3d at 680; accord, e.g., Tankleff v. Senkowski, 135 F.3d 235, 252 (2d Cir. 1998).

It is clearly improper for the prosecutor to usurp the traditional role of the trial court by instructing the jury on the law. See Ex parte United States, 101 F.2d 870, 874 (7th Cir. 1939) ("The constitutional guaranty restrains the lay jury to the limited and special role of determining controverted issues of fact. Questions of law, methods of practice, and points of procedure are exclusively the province of the judge.")(citation omitted). Although this Court questions the wisdom of permitting the prosecutor to use a Power Point demonstration to display the jury instructions during summation and to read the instructions to the jury, this Court does not have supervisory authority over the state trial courts. The Court is limited to determining whether the prosecutor's comments caused substantial prejudice to Petitioner.

Even assuming that it was improper for the prosecutor to use Power Point slides to reiterate the judge's jury instructions on various legal terms, the Court concludes that it did not amount to severe misconduct: As Petitioner concedes, the content of the slides accurately described the legal definitions of depraved indifference and recklessness.

Turning to the adequacy of the trial court's curative instructions, it was not unreasonable for the Court of Appeals to find that the judge's instructions were adequate to dispel any

possibility that the jury would give precedence to the prosecutor's slides over the trial judge's actual instructions. Moreover, as the Supreme Court has repeatedly noted, jurors are presumed to follow a court's instructions. <u>E.g.</u>, <u>Greer v. Miller</u>, 483 U.S. 756, 766 n. 8 (1987); <u>Francis v. Franklin</u>, 471 U.S. 307, 324 n. 9 (1985); <u>accord</u>, <u>e.g.</u>, <u>United States v. Downing</u>, 297 F.3d 52, 59 (2d Cir. 2002).

Finally, turning to the likelihood of Petitioner's conviction absent the challenged conduct by the prosecutor, the Court finds that the proof of Petitioner's guilt was compelling and substantial. The use of the Power Point slides to display portions of the jury instructions that the trial judge would later read to the jury did not "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." <u>Darden</u>, 477 U.S. at 181 (citation omitted). The Court of Appeals did not unreasonably apply clearly established Supreme Court precedent in declining to reverse Baker's conviction on this basis. Therefore, this Court may not grant habeas relief on this claim.

**C.   Ineffective Assistance of Trial Counsel**

**1.   Background**

Baker contends that trial counsel was ineffective in failing to request the trial court to instruct jurors that they should consider the three homicide counts in the alternative, rather than instructing them to return a verdict for all three homicide counts.

He reasons that the erroneous jury instruction relieved jurors "of their responsibility" to decide "with which mental state the homicide was committed" and resulted in his conviction of three separate offenses for the same criminal act. Pet. at 11.

At the trial, the trial court informed the parties that it intended to allow the jury to consider all three homicide counts and would not charge them in the alternative. Defense counsel agreed to this presentation under People v. Trappier, 87 N.Y.2d 55, 59 (1995). Petitioner contended on appeal his attorney's acquiescence constituted ineffective assistance of counsel because depraved indifference murder of a child, manslaughter in the first degree and manslaughter in the second degree are inconsistent counts that should have been charged to the jury in the alternative pursuant to People v. Gallagher, 69 N.Y.2d 525, 529 (1987) ("[A] defendant who acts with the conscious objective of bringing about a particular result cannot simultaneously act with conscious disregard of a substantial and unjustifiable risk that the very result will occur.").

To provide some context for this claim, Gallagher was a homicide case in which the defendant was convicted of both intentional murder and reckless manslaughter of a single victim. Those counts were inconsistent: "[W]here the shooting (the act) and the death (the result) are the same, a defendant cannot be convicted twice for the murder, once for acting 'intentionally' and

once for acting 'recklessly[.]'" <u>Trappier</u>, 87 N.Y.2d at 59 (quoting <u>Gallagher</u>, 69 N.Y.2d at 529; citations omitted in original). In <u>Trappier</u>, as in <u>Gallagher</u>, the criminal act was the same for the attempted assault and the reckless endangerment counts–i.e., the shooting. <u>Trappier</u>, 87 N.Y.2d at 59. In <u>Trappier</u>, unlike in <u>Gallagher</u>, the counts entailed two distinct results: The result required under first degree reckless endangerment was the reckless creation of a grave risk of death, while to be guilty of attempted first degree assault, the defendant must have attempted to cause serious physical injury, while possessing the specific intent to cause such injury. <u>Trappier</u>, 87 N.Y.2d at 59. The Court of Appeals reasoned that "[a] defendant could certainly intend one result—serious physical injury—while recklessly creating a grave risk that a different, more serious result—death—would ensue from his actions." <u>Id.</u> Therefore, in <u>Trappier</u>, the verdicts were not inconsistent. <u>Id.</u>

### 2.  The Court of Appeals' Ruling

On appeal, the Court of Appeals noted that "[d]eciding whether [Baker]'s trial lawyer was ineffective when he agreed that the jury should consider all three homicide offenses requires us to assess our precedent addressing inconsistent counts." After explaining the holdings in <u>Gallagher</u> and <u>Trappier</u>, the Court of Appeals observed that it had "recently determined that a defendant can be convicted of both first-degree intentional manslaughter (Penal Law

-28-

§ 125.20(1)) and depraved indifference murder because the former crime requires an intent to inflict serious physical injury whereas the latter requires the reckless creation of a different result—a grave risk of death[.]" Id. (citing Matter of Suarez v. Byrne, 10 N.Y.3d 523, 540-41 (2008)).

Reading those precedents together, the Court of Appeals concluded that "the counts of depraved indifference murder of a child and first-degree manslaughter as charged in the indictment were not inconsistent and it was proper to allow the jury to consider both offenses simultaneously rather than in the alternative." Baker, 14 N.Y.3d at 271. Depraved indifference murder of a child under P.L. § 125.25(4) requires that the defendant recklessly create a grave risk of serious physical injury or death under circumstances evincing a depraved, while first degree manslaughter under P.L. § 125.20(4) involves an intent to cause physical injury. Id. at 272. Because, as Trappier held, a defendant can "certainly intend one result . . . while recklessly creating a grave risk [of] a different, more serious result[,]" 87 N.Y.2d at 59, Baker's counsel's "failure to object to the court's proposed charge with respect to these two counts did not amount to ineffective legal assistance." Id.

The Court of Appeals went on to note that whether manslaughter in the second degree should have been charged as a lesser-included, alternative offense of the count of depraved indifference murder of

-29-

a child was a "closer question" in light of its precedent holding that manslaughter in the second degree is a lesser-included offense of depraved indifference murder of an adult under P.L. § 125.25(2). See People v. Atkinson, 7 N.Y.3d 765, 766-67 (2006). The Court of Appeals, to date, has not examined whether that also applies to depraved indifference murder of a child under P.L. § 125.25(4), but "Third and Fourth Departments have considered this issue and ruled that second-degree manslaughter is not a lesser included offense of depraved indifference murder of a child[.]" People v. Baker, 14 N.Y.3d at 272 (citing People v. Heslop, 48 A.D.3d 190, 195-96 (3d Dept. 2007), lv. denied, 10 N.Y.3d 935 (2008); People v. Robinson, 278 A.D.2d 798 (4th Dept. 2000), lv. denied, 96 N.Y.2d 762 (2001)). Hence, the Court of Appeals concluded, "it was not unreasonable for [Baker]'s trial attorney to believe that the jury could consider both depraved indifference murder of a child and manslaughter in the second degree, and that those counts did not have to be charged in the alternative[.]" Id. (citing People v. Carter, 7 N.Y.3d 875, 876-77 (2006) ("Trial counsel might have made an argument based on People v. Robinson[,] (145 A.D.2d 184 ([4th Dept.] 1989), aff'd[,] 75 N.Y.2d 879 (1990)), but in light of our later decision in People v Trappier[,] (87 N.Y.2d 55 (1995))[,] that argument was not so compelling that a failure to make it amounted to ineffective assistance of counsel[.]") (citation omitted)).

3.   **Merits**

The foregoing adjudication on the merits by the Court of Appeals is entitled to the deferential AEDPA standard of review set forth in 28 U.S.C. § 2254(d)(1). Baker may obtain relief on his ineffective assistance claim only if he can demonstrate that the Court of Appeals' holding was contrary to, or an unreasonable application of, the clearly established Supreme Court law regarding this issue, Strickland v. Washington, 466 U.S. 668 (1984). The Court of Appeals applied People v. Baldi, 54 N.Y.2d 137 (1981), which the Second Circuit has determined is not "contrary to" Strickland for purposes of 28 U.S.C. § 2254(d)(1). Rosario v. Ercole, 601 F.3d 118, 124 (2d Cir. 2010) (citation omitted). Thus, Baker must show that the Court of Appeals unreasonably applied Strickland. This he cannot do.

In order to prevail on an ineffective assistance of counsel claim, Strickland requires a habeas petitioner to show that his counsel provided deficient representation, and that he suffered prejudice as a result of that deficient performance. Strickland, 466 U.S. at 687. Prejudice requires the petitioner to "show that there is a reasonable probability that, but for counsel's unprofessional" performance, the result of the proceeding would have been different. Id. at 694. The issue before this Court on habeas review "'is not whether [it] believes the state court's determination' under the Strickland standard 'was incorrect but

-31-

whether that determination was unreasonable–a substantially higher threshold.'" Knowles v. Mirzayance, 556 U.S. 111, ___, 129 S. Ct. 1411, 1420 (2009) (quoting Schriro v. Landrigan, 550 U.S. 465, 473 (2007)). "[B]ecause the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." Knowles, 129 S. Ct. at 1420 (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

To recap, there were two alleged errors by trial counsel: (1) failure to request the submission of the three homicide counts in the alternative; and (2) failure to request submission of manslaughter in the second degree as a lesser included, alternative offense of the count of depraved indifference murder of a child under P.L. § 125.25(4). See Baker, 14 N.Y.3d at 271-72. With regard to the first alleged error, Respondent argues that the Court of Appeals "expressly held that the jury charge comported with its own case law on the issue" and thus, "even if counsel had objected to the submission of the three counts, that objection ultimately would not have succeeded." Resp't Mem. at 41. The Court agrees with Respondent. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.") (citation omitted). Given the Court of Appeals' interpretation of its case law regarding inconsistent verdicts, the Court finds that

trial counsel was not objectively unreasonable, in light of prevailing professional norms, when he agreed to submit all three homicide counts to the jury. Furthermore, because in all probability such a request would not have been granted, trial counsel's performance in this regard did not prejudice the defense. See, e.g., Lopez v. Greiner, 323 F. Supp.2d 456, 480 (S.D.N.Y. 2004) ("[T]o find that Lopez has established prejudice under Strickland would require the Court to substitute its own judgment for that of the state court on an unsettled question of purely state law. Lopez therefore cannot establish that had trial counsel made a suppression motion, 'the result of the proceeding would have been different.' Strickland, 466 U.S. at 694, 104 S.Ct. 2052.").

Although there was a second ineffective assistance claim presented to the Court of Appeals-i.e., trial counsel's failure to object to the second degree manslaughter charge and instead request that it be charged as a lesser included offense of depraved indifference murder of a child-Petitioner has not raised it in his habeas petition.

## III. Motion to Stay

Petitioner has filed a motion to stay the petition (Dkt. #6) in order to return to state court and exhaust several additional claims: (1) he received the ineffective assistance of counsel when counsel failed to object to and preserve an appellate claim that the guilty verdict was inconsistent; (2) prosecutorial misconduct

based upon the introduction of uncharged crimes (that Petitioner threw Jordan into his metal crib three days prior to his murder, causing the child to suffer a seizure and hospitalization); and (3) prosecutorial misconduct based upon a multiplicitous and duplicitous indictment. He also seeks leave to amend the petition to include these claims. See Dkt #6. Respondent opposed the request for a stay. See Dkt. #11. Petitioner's Traverse (Dkt. #17), which was docketed as a response to Respondent's Opposition Memorandum of Law (Dkt. #10), elaborates on his proposed amended claims.

In Rhines v. Weber, 544 U.S. 269 (2005), the Supreme Court held that the stay and abeyance procedure should be used sparingly and only where a "district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court," where the unexhausted claims are not "plainly meritless", and the petitioner has not engaged in "intentionally dilatory litigation tactics". Id. at 277-78.

Here, Petitioner has not offered any reason for failing to exhaust his state remedies before filing his habeas petition. The proposed amended claims are all record-based claims, and Petitioner could have exhausted them by asserting them in a pro se supplemental appellate brief on direct appeal. Baker also could have raised them in a motion to vacate pursuant to New York Criminal Procedure Law § 440.10, but they would have been dismissed

based upon the mandatory procedural bar in C.P.L. § 440.10(2)(c) because they could have been raised on direct appeal.

In any event, where Petitioner has offered no reason for his failure to exhaust these proposed claims earlier, it would be an abuse of discretion to grant a stay-and-abeyance. See Rhines, 544 U.S. at 277 ("Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court.").

## IV. Conclusion

For the foregoing reasons, the petition (Dkt. #1) is dismissed. The motion for a stay (Dkt. #6) is denied with prejudice. No certificate of appealability shall issue because Petitioner has not made a substantial showing of the denial of a constitutional right. See 28 U.S.C. § 2253(c)(2).

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3) and FED. R. APP. P. 24(a)(3), that any appeal from this Decision and Order would not be taken in good faith, and therefore leave to appeal as a poor person is denied. See Coppedge v. United States, 369 U.S. 438, 445-46 (1962). Any application for leave to appeal in forma pauperis must be made to the Second Circuit Court of Appeals in accordance with FED. R. APP. P. 24(a)(1), (4), & (5). See id. Petitioner must file any notice of appeal with the Clerk's Office,

United States District Court, Western District of New York, within

thirty (30) days of the date of judgment in this action.

**SO ORDERED.**

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     Rochester, New York
           May 25, 2012